UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| LINDA MORRIS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:06CV622 TIA |
| ) | |
| MICHAEL J. ASTRUE,[1] COMMISSIONER ) | |
| OF SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

This matter is before the Court under 42 U.S.C. §§ 405(g) for judicial review of the denial of Plaintiff's application for Disability Insurance Benefits under Title II of the Social Security Act.[2] The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

## Procedural History

On June 29, 2004, Plaintiff filed an applications for Disability Insurance Benefits (DIB), alleging disability beginning April 15, 1998, due to arthritis in the spine and back, poor circulation, and headaches. (Tr. 74, 94-96, 105) The application was denied, and, on August 31, 2004, Plaintiff filed a request for hearing before an Administrative Law Judge (ALJ). (Tr. 56, 70-71, 74-77) On October 13, 2005, Plaintiff testified before the ALJ, who determined that Plaintiff was not under a disability and was not entitled to a Period of Disability or DIB in a decision dated November 25,

---

[1] Michael J. Astrue became the Commissioner of Social Security on February 12, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue is substituted for Commissioner Jo Anne Barnhart, as the proper party defendant. See 20 C.F.R. § 422.210(d).

[2] Although Plaintiff asserts that she also filed a claim for Supplemental Security Income (SSI), the undersigned is unable to locate any such application in the record, nor has Plaintiff cited any transcript page(s).

2005. (Tr. 13-45) On March 5, 2006, the Appeals Council denied Plaintiff's request for review. (Tr. 5-7) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

**Evidence Before the ALJ**

During the hearing dated October 13, 2005, Plaintiff testified before the ALJ and was represented by counsel. Plaintiff was born on March 29, 1951 and was 54 years old at the time of the hearing. She lived with her husband and her 73-year-old mother. She weighed 250 pounds and measured 5 feet 6 inches. Plaintiff stated that she had gained about 15 pounds over the past two months, which she attributed to medication. (Tr. 23-25)

Plaintiff testified that she had health insurance through her husband's job. Plaintiff completed the 10th grade, then went to school to become a beautician/cosmetologist. While she did work in that profession, it was 10 years ago. Plaintiff had a driver's license but could not drive long distances without stopping. However, her car was equipped with a lumbar support. Her husband drove her to the hearing because traffic made her nervous. (Tr. 25-27)

Plaintiff stated that she last worked as a childcare worker. She started as a cook and then moved to cleaning. Plaintiff believed that she last worked in 1996. Prior to that time, she worked for Hickory Farms, cutting cheeses, operating the cash register, and sometimes computing payroll. She also worked as a hairdresser. Both jobs required her to stand up a lot. (Tr. 28)

Plaintiff testified that she could no longer work full time because she could not sit or stand for long periods of time because of her back and knee. She also stated that she was tired all the time. Plaintiff visited Dr. Knapp on a regular basis for her back and leg problems. According to Plaintiff, Dr. Knapp diagnosed her with fibromyalgia two years ago, although her symptoms began in 1998 or 1999. Dr. Knapp also diagnosed rheumatoid arthritis in her knees in 1999 or 2000. Plaintiff testified

that the pain in her left knee was so bad it kept her up at night. She was able to tolerate her right knee pain. Plaintiff also stated that her leg swelled from her knee to her ankle on a daily basis. Standing for about an hour or two triggers the swelling. She would use ice and heat when swelling occurred. (Tr. 29-31)

Plaintiff further testified that she took prescribed medications for pain every day, and tried to stay on a medication schedule. She was prescribed two new medications for arthritis, but she did not need a knee replacement. Plaintiff stated that her lower back hurt all the time and that the middle of the back started hurting when she tried to clean the house or stood while washing dishes. She opined that she could stand for 20 or 30 minutes before she experienced back pain requiring her to move around or sit. Plaintiff further testified that she had problems with the muscles in her neck and her shoulder bones. The pain began 4 months ago, but she had not discussed it with her doctor. (Tr. 31-33)

Plaintiff stated that her condition has worsened since another ALJ denied benefits in 2002. She described the problem as being tired in her muscles and experiencing an aching feeling all the time. She noted that the doctor finally diagnosed fibromyalgia. Plaintiff also testified to having diabetes and high cholesterol. In addition, she experienced gout flare-ups. She described these flare-ups as bobbing and painful, which occurred about every two weeks. She did not take medication for the gout because she could not afford all the different medications. Plaintiff experienced a gout flare-up in both feet the night before the hearing. She described the pain as a little stabbing pain in the tip of her toes, which was like arthritis. The flare-ups could last all day or 3 or 4 hours. While she could walk, it felt like someone was stabbing her toes. (Tr. 33-35)

Plaintiff also had problems with her hips. She explained that she had arthritis in her spine and

3

one leg shorter than the other, which aggravated her hip. While she tried not to, she did walk with a limp which began a year ago. In addition to seeing Dr. Knapp, Plaintiff also saw Dr. Van Ryan for a possible knee replacement. She stated that she planned to follow-up with Dr. Van Ryan to determine whether the medication and the exercises helped her knee. Plaintiff testified that she had been doing the knee exercises but that she had not noticed any pain relief. Instead, she experienced knee swelling. (Tr. 35-36)

Plaintiff also testified regarding emotional problems, stating that she did not take any medication for such. Although her medical records reported possible depression, Plaintiff believed she was aggravated, not depressed. She attributed her aggravation to her inability to perform activities such as gardening. Plaintiff reduced her outdoor work a couple years before but continued to try to keep her roses trimmed. She no longer got down on knees to plant, but she tried to work for awhile and then returned to the house to sit down. Plaintiff opined that she could work about 20 to 30 minutes before her hip, back, and knees began to hurt. (Tr. 36-37)

In addition, Plaintiff experienced problems sleeping. She testified to having pain in her back and numbness in her legs and arms. She propped up her leg with a pillow but still had pain in her knee. She described said pain as "like somebody stuck a hot poker on your knee . . . or in your lower spine." Plaintiff stated that she slept about 4 hours in a night. Because she was tired during the day, Plaintiff took a nap everyday, which lasted anywhere between 1 and 4 hours. (Tr. 37-38)

Plaintiff was able to take showers and baths. Her husband installed a whirlpool tub which helped relieve the muscle pain. Plaintiff sometimes did the laundry; however, her mother also helped. Plaintiff could only do one load at a time because the bending, sorting, and removing from the dryer hurt her lower back. With regard to other chores, Plaintiff testified that her husband did the mopping.

4

Plaintiff sometimes cooked, but her husband also took over that chore because she had to sit down. In addition, Plaintiff's husband wanted to try things he watched on television cooking shows. Plaintiff was able to lift lightweight pots and pans. She grocery shopped with her husband, and he did all the lifting. Plaintiff was able to lift some things and put them in the refrigerator. She opined that she could lift a 10-pound bag of potatoes, but not for very long. She would then experience pain in her back, left shoulder, and neck. (Tr. 38-41)

During the day, Plaintiff read and did puzzle books. In the evening, she watched television. When she could no longer sit, she dusted the TV and the tables. Plaintiff stated that she had to switch positions to get comfortable. However, there was no position that gave her complete pain relief. Plaintiff further testified that she could no longer walk or bike. She and her husband recently vacationed in Branson, Missouri, during which time they shopped, ate at restaurants, went to shows at Silver Dollar City. Plaintiff explained that they went to the shows to avoid all the walking at the theme park. (Tr. 41-42)

Upon examination by the ALJ, Plaintiff stated that her husband worked at The Reliable Pharmaceutical. Plaintiff's last job was at a daycare. She quit because she needed to sit frequently, and her boss refused to let her do so. Plaintiff also worked as a cashier at Hickory Farms and as a copier at Kinko's. She left her job at Kinko's because it required standing all day. Plaintiff was on a diabetic diet, and a dietician recommended that she lose weight. Plaintiff testified that she started losing weight but her medications caused her to regain the weight. Plaintiff quit smoking 8 or 9 years ago, and she drove 4 or 5 times a week. Plaintiff went to the drug store and her daughter's house. Plaintiff also attended church. (Tr. 42-45)

**Medical Evidence**

On October 9, 1998, Plaintiff complained of low back pain and spasms. Dr. Light assessed lumbosacral strain secondary to lifting. Dr. Light also noted that Plaintiff was seriously obese. (Tr. 261) On November 5, 1998, an x-ray of the cervical spine revealed a straightening of the usual cervical lordosis. The report also noted a history of osteoarthritis. (Tr. 282) An x-ray of the lumbosacral spine performed the same date showed lumbar levoscoliosis but no other osseous abnormality. (Tr. 283) Plaintiff complained of chest pain in February 1999. Testing revealed normal resting 2-D echocardiogram and no segmental wall motion abnormality immediately post exercise. (Tr. 277-281)

On May 18, 2000, Plaintiff was diagnosed with gout and prescribed Colchicine. (Tr. 328) Plaintiff underwent an MRI of the cervical spine on August 2, 2000. The test revealed no evidence of disc bulge or herniation at any level. There was no congenital stenosis of the spinal canal, and the vertebral body bone marrow signals were normal. However, the MRI did reveal a 5.0 mm diameter perineural cyst of the left C7/T1. (Tr. 292)

On February 20, 2001, Plaintiff underwent a hepatobiliary scan, which was negative. A gallbladder ejection fraction revealed a hypokinetic gallbladder with an ejection fraction of 27%, which was below the 30% normal limit. (Tr. 295) After complaints of intermittent right upper quadrant abdominal pain, Plaintiff underwent surgery on March 16, 2001 for biliary dyskinesis and possible chronic cholecystitis. (Tr. 183) On September 19, 2001, a CT abdomen study revealed a small splenic mass located on the medial aspect of the spleen. The test also showed atherosclerotic vascular disease involving the aorto, iliac and femoral arteries and post surgical changes cholecystectomy. (Tr. 182)

Plaintiff called Dr. Knapp on June 3, 2002 with complaints that her gout medication was not

6

helping and her feet constantly hurt. (Tr. 233) Dr. Knapp examined Plaintiff on June 4, 2002 and diagnosed multiple arthralgias, hyperlipidemia, abnormal liver enzymes, and gout. During the examination, Plaintiff reported bike riding 1 to 2 times a week, walking 1 mile 3 to 5 times a week, and cutting the grass 1 to 2 times a week. (Tr. 230-231) On June 19, 2002, Plaintiff underwent x-rays of her right and left ankles. The left ankle showed no acute abnormality, but the right ankle x-ray revealed fractures of the posterior malleolus and the lateral malleolus and suspected acute fracture from the inferior tip of the medial malleolus. (Tr. 418-419)

CT scans of the abdomen and pelvis on October 1, 2002 revealed prominent head of the pancreas which required a repeat CT scan. On October 11, 2002, Plaintiff underwent an ERCP as indicated by an abnormal computed tomogram. The impressions were normal pancreatogram with nothing to suggest a pancreatic mass and a normal cholangiogram. Plaintiff was discharged with instructions to repeat the CT scan of the abdomen in 3 months. (Tr. 382)

On January 17, 2003, Plaintiff underwent a pre and post contrast CT of the abdomen. There was no change in the enhancing lesion median aspect of the spleen since the previous examination, and eemostasis clips in the gallbladder were consistent with her prior cholecystectomy. The post contrast CT of the pelvis was negative. (Tr. 179)

In a letter dated May 6, 2003, Dr. Steven W. Baak informed Dr. Stephen Knapp, Plaintiff's primary physician, that Plaintiff had early degenerative joint disease of the knees with crepitation, and some diffuse tenderness of the lateral trochanters and myfascial trigger points over the lateral thighs and upper back. Dr. Baak also noted that Plaintiff seemed to be chronically depressed with a lot of insomnia problems. He prescribed physical therapy, Flexeril, and Celexa. Dr. Baak recommended a follow-up in 2 months, at which time he expected Plaintiff to be better. (Tr. 414)

A November 12, 2003 CT scan of the abdomen and pelvis revealed mild splenomegaly. The test noted a rounded mass within the spleen which was increased slightly from the prior study. In addition, the there was a fatty change in the liver. (Tr. 177)

A letter dated March 18, 2004 from Rosemary Gaertner, R.N., MSN, CFNP, on behalf of Dr. Baak, noted that Plaintiff continued to complain of neck and back pain. During her examination on that same date, Plaintiff reported discontinuing the use of her medications. Plaintiff had a number of stressors in her life but lacked the insight into her anxiety and depression. Dr. Baak injected several trigger points, (L) trap, rhomboid and inferior clavicular areas and paracervical and rhomboid areas, to which Plaintiff responded favorably. He prescribed 37.5 mg of Effexor to be increased to 75 mg. However, Dr. Baak foresaw greater dosage requirements in the future. He also prescribed Zanaflex at bedtime. Dr. Baak requested that Plaintiff return in 1 month. He also recommended that she continue to be active but not to overdue it, as activity impacts her myfascial pain symptoms. Dr. Baak opined that she would need more trigger point injections and possibly in the sacroiliac areas as well. (Tr. 220, 271) On April 15, 2004, Plaintiff reported that her neck and shoulder pain was a little better. She also thought the Effexor was working, and she was sleeping better. (Tr. 220)

Dr. David M. Margolis examined Plaintiff on May 20, 2004 for considerable GERD symptoms. In a letter to Dr. Knapp, Dr. Margolis explained that Prevacid did not help Plaintiff. A previous upper endoscopy showed only a hiatal hernia. Dr. Margolis gave Plaintiff some Nexium samples. Because Plaintiff could not afford the Nexium prescription, she planned to try generic Prilosec when her samples ran out. (Tr. 270)

June 1, 2004 treatment notes revealed complaints of shortness of breath; chest pain; muscle cramps in legs, feet, and neck; ability to sleep only with a sleeping pill; and painful arthritis. Plaintiff

8

was not in acute distress, and all systems were negative except for neck pain and some respiratory difficulties. (Tr. 219) A magnesium lab test suggested a past Epstein-Barr virus infection. (Tr. 350) In addition, a chest CT revealed a well defined calcified granuloma, measuring about 11 mm in maximum dimensions in the anterior segment of the right upper lobe. The remainder of the examination was otherwise unremarkable. (Tr. 309)

Dr. Knapp examined Plaintiff on July 2, 2004. Plaintiff was in no acute distress, but she exhibited right and left CVA tenderness. Dr. Knapp diagnosed fibromyalgia and fatigue. (Tr. 216-217)

On June 29, 2004, R. Shannon interviewed Plaintiff via telephone on behalf of the Social Security Administration. Plaintiff demonstrated difficulty concentrating and had difficulty remembering dates. However, Plaintiff was cooperative during the interview. (Tr. 102-104)

On August 31, 2005, Plaintiff complained of left knee pain, itchy arms, and spotting. There was no rash, and Plaintiff was alert and in no acute distress. Her weight was 248, and the examining physician ordered further testing for diabetes. (Tr. 192-193)

Treatment notes dated October 3, 2005 revealed early osteoarthritis with some degenerative meniscus; however, Dr. Knapp recommended keeping the cartilage instead of removing it. Plaintiff expressed the desire to get back to walking and try to control her weight. She denied any significant prior problems with her knee, and she reported minor aches in the past but nothing significant. Past medical history was unremarkable except for diabetes, high cholesterol, mild gastric reflux, fatigue, weight gain, chest pain, and occasional shortness of breath. Plaintiff also reported occasional muscle cramping and difficulties sleeping. Physical examination revealed a pleasant and cooperative woman. She had a minor antalgic gait with a quick component on the left side. Plaintiff was also exquisitely

tender over the medial joint line. Range of motion was of the left knee was 0 to 120 degrees compared to 0 to 130 degrees on the right knee. She could not tolerate full extension or flexion on the left knee. Prior x-rays revealed mild decrease in her medial joint interval with less than 50% on the left knee and none on the right knee. Dr. Knapp's plan was for Plaintiff to begin an arthritis program consisting of taking Glucosamine and Chondroitin Sulfate; getting some good impact absorbent footwear; participating in a light bicycle exercise program; and gradually phasing back to walking and strengthening. Plaintiff was to follow up in 4 weeks. (Tr. 169-170)

On October 5, 2005, Dr. Knapp completed a Physical Residual Functional Capacity Questionnaire. He noted that he treated Plaintiff from February 1997 to present and that he had seen Plaintiff twice in 2005. He diagnosed L5-S1 radiculopathy; lumbar degenerative spine disease; depression; diabetes mellitus; hyperlipidemia; and fibromyalgia. He rated her prognosis as fair. Plaintiff's symptoms were low back pain, fatigue, and arthritic myalgia. Clinical findings and objective signs included straight leg raising on the left. She had poor response to medication for fibromyalgia and mixed response to anti-inflammatories. Dr. Knapp opined that Plaintiff's impairments lasted or could be expected to last at least 12 months. Plaintiff was not a malinger, and she had several emotional factors which contributed to the severity of her symptoms and functional limitations including depression, anxiety, somatoform disorder, and psychological factors affecting physical condition. (Tr. 172-173)

Dr. Knapp also noted that Plaintiff's impairments were reasonably consistent with her symptoms and functional limitations described in the evaluation. He opined that Plaintiff's pain or other symptoms frequently would interfere with the attention and concentration needed to perform simple work tasks. However, he believed that Plaintiff was capable of tolerating low stress jobs. Dr.

10

Knapp opined that Plaintiff could walk 2 city blocks without rest or severe pain; sit for 20 minutes at one time; stand for 15 minutes at one time; sit about 4 hours total in an 8-hour workday; and stand about 2 hours total in an 8-hour workday. Plaintiff needed to walk around during an 8-hour workday, specifically every 20 minutes for approximately 3 minutes each time. Dr. Knapp further opined that Plaintiff needed a job that permitted shifting positions at will from sitting , standing, or walking. In addition, she would need to take unscheduled breaks occasionally. Plaintiff did not need to elevate her legs or use a cane or other assistive device. Dr. Knapp noted that Plaintiff could occasionally lift 10 pounds and rarely lift 20 or 50 pounds. She could frequently look down, turn her head, and look up. However, she could only occasionally hold her head in a static position. Plaintiff was able to frequently twist, stoop, and crouch. She could climb ladders and stairs occasionally. She had no significant limitations with reaching, handling, or fingering. (Tr. 173-176)

## **The ALJ's Determination**

In a decision dated November 25, 2005, the ALJ found that Plaintiff met the disability insured status requirements of the Social Security Act through June 30, 2003, but not thereafter. She had not engaged in any disqualifying substantial gainful activity. Plaintiff had obesity; hyperlipidemia; gastroesophageal reflux disease; arterial vascular calicification in the aorta, iliac, and femoral arteries; early degenerative joint disease of the knees; a C7-T1 perineural cyst; a history of gout; and status post gallbladder removal. The combination of the impairments produced severe limitations. However, there was no evidence of a severe mental impairment prior to June 30, 2003. (Tr. 19)

The ALJ further found that Plaitniff did not have an impairment or combination thereof listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4. Her subjective complaints were not consistent with the medical evidence in the record, and her allegations were only

11

credible to the extent of the limitations found in the ALJ's determination. The ALJ found that Plaintiff possessed the residual functional capacity (RFC) to occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; sit 6 hours in an 8-hour workday; stand/walk 6 hours in an 8-hour workday; occasionally stoop and crouch; and push/pull consistent with her lifting limitations. She had no non-exertional limitations. Further, the ALJ determined that Plaintiff's past relevant work as a child care worker and cook did not require the performance of work-related activities precluded by her limitations. The ALJ found that her impairments did not prevent her from performing her past relevant work. Therefore, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Act, at any time through June 30, 2003 and was not entitled to a Period of Disability or Disability Insurance Benefits. (Tr. 19)

Specifically, the ALJ considered the Plaintiff's prior work record; information and observations by treating and examining physicians and third parties; precipitating and aggravating factors; type, dosage, effectiveness, and adverse side-effects of any pain medication; other treatment for relief of pain or other symptoms; functional limitations; and daily activities. The ALJ assessed Plaintiff's testimony, along with the objective medical findings prior to June 30, 2003, and found that the objective medical evidence failed to provide strong support for Plaintiff's allegations of disabling symptoms and limitations. The ALJ noted that Plaintiff had a relatively limited history of medical treatment prior to her date last insured. Plaintiff's only surgery was gallbladder surgery, and she had no history of chiropractic treatments or treatment at a pain clinic. Further, Plaintiff never used a TENS unit for pain, and nothing in the record indicated recent ER treatment or hospitalizations for pain relief. She had not received treatment for her alleged mental impairments. The ALJ determined that the absence of consistent treatment during the period of alleged disability was inconsistent with

12

severe and disabling symptoms. (Tr. 14-16)

Although Dr. Knapp's report was somewhat supportive of Plaintiff's alleged disability, the ALJ noted that Dr. Knapp relied heavily on Plaintiff's subjective reports of her symptoms and limitations. In addition, the ALJ pointed out inconsistencies in Dr. Knapp's opinions, such as a stand/walk limitation in addition to a walking requirement during a workday. Further, while Dr. Knapp noted severe symptoms that would frequently interfere with Plaintiff's ability to perform simple work tasks, he also opined that she was capable of performing low-stress jobs. Additionally, the ALJ found that the October 2005 statement by Dr. Knapp was dated more than 2 years after Plaintiff's last insured date. The ALJ also noted that the record did not contain any opinions from other treating or examining doctors indicating that Plaintiff was disabled or had limitations greater than those found by the ALJ. In addition, the ALJ mentioned that the conclusions of the psychologist employed by the State supported a finding of "not disabled" based on insufficient evidence of a mental impairment. However, the ALJ cites no transcript page for this statement. (Tr. 16-17)

Further, the ALJ assessed Plaintiff's daily activities which could not be verified by objective evidence in view of the weak medical evidence. Further, Plaintiff's medications did not suggest more limiting impairments, nor did she allege any persistent side effects. In addition, Plaintiff's poor earnings history raised a question as to whether her unemployment was due to medical impairments. After considering the entire record, the ALJ found that Plaintiff had the RFC to perform her past relevant work as a child care worker and cook. He based his decision on Plaintiff's descriptions of these work-related activities which included lifting less than 10 pounds and standing only 5hours in an 8-hour workday, which constituted light work. The ALJ further determined that Plaintiff did not

meet her burden of demonstrating an inability to perform her past relevant work. Thus, the ALJ concluded that Plaintiff was not under a disability at any time through the date of the decision. (Tr. 17-18)

## **Legal Standards**

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that plaintiff is not engaged in substantial gainful activity; (2) that she has a severe impairment or combination of impairments which significantly limits her physical or mental ability to do basic work activities; or (3) she has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work; and (5) her impairments prevent her from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F. 3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh the evidence or review the record de novo. Id. at 1328 (citing Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). Instead, even if it is possible to draw two different conclusions from the

evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-586 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that he or she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[3] standards and whether the evidence so contradicts plaintiff's subjective

---

[3]The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d

complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. Marciniak 49 F.3d at 1354.

## Discussion

The Plaintiff first argues that the ALJ erred by failing to properly assess Plaintiff's RFC. Plaintiff also contends that the ALJ erred by failing to call a vocational expert (VE) and by failing to consider age as a vocational factor. The Defendant, on the other hand, contends that the ALJ properly assessed Plaintiff's RFC and that a VE was not required where the ALJ did not rely on the medical-vocational guidelines. The Defendant also asserts that at step four, the ALJ was not required to consider Plaintiff's age. Thus, the Defendant maintains that substantial evidence supports the ALJ's determination.

The undersigned agrees that substantial evidence supports the findings of the ALJ. The record shows that the ALJ properly assessed Plaintiff's RFC in this case. Plaintiff argues that the ALJ erroneously relied on a State consultative examination to support his determination that Plaintiff was not disabled. However, the ALJ's written opinion belies this argument. While the ALJ mentioned State agency consultants in one small paragraph, the opinion in its entirety demonstrates that the ALJ relied heavily on all of the evidence contained in the record. In addition, the only State agency assessment was by a psychologist who concluded that there was insufficient evidence of a mental impairment. (Tr. 112) Further, the Defendant correctly notes that Plaintiff did not claim that she had a mental impairment. Neither her application nor her hearing testimony asserts a mental impairment

---

1320, 1322 (8th Cir. 1984).

as a basis for disability benefits. Indeed, Plaintiff testified that she was merely aggravated, not depressed. (Tr. 36) "[A]n ALJ is not obligated 'to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability.'" Gregg v. Barnhart, 354 F.3d 710, 713 (8th Cir. 2003) (quoting Pena v. Chater, 76 F.3d 906, 909 (8th Cir. 1996)). In Gregg, the Eighth Circuit Court of Appeals specifically noted the plaintiff's testimony that he did not believe he had mental problems. Id.

With regard to the ALJ's determination of Plaintiff's RFC, the undersigned finds that the ALJ properly assessed the opinion of Dr. Knapp, Plaintiff's treating physician. Plaintiff relies on Dr. Knapp's statement in the Physical Residual Functional Capacity Questionnaire that Plaintiff was limited to sedentary work. First, although a treating physician's opinion regarding a plaintiff's ability to work, combined with other medical information may aid the ALJ in making a disability determination, "the ultimate determination of disability . . . is a question for the SSA, not a physician." Samons v. Astrue, ___ F.3d ___, No. 06-2289, 2007 WL 2296416, at *4 (8th Cir. Aug. 13, 2007) (citations omitted). The undersigned acknowledges that "[a] treating physician's opinion 'regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'" Id. at *2 (quoting Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000)). However, "the ALJ may give a treating doctor's opinion limited weight if it provides conclusory statements only . . . or is inconsistent with the record. Id. (citations omitted).

In the present case, the ALJ noted several inconsistencies within Dr. Knapp's opinion and with his other treatment notes, and he pointed out the lack of supporting objective medical evidence.

For instance, the ALJ found that Dr. Knapp relied heavily on Plaintiff's subjective complaints in his 2005 questionnaire. (Tr. 16) Further, Dr. Knapp's answers were inconsistent in that they recommended stand/walk limitations in addition to walking requirement; noted symptoms that would interfere with simple work tasks yet opined that Plaintiff could perform low-stress jobs; and acknowledged that he only saw Plaintiff twice in 2005. (Tr. 16-17) The ALJ additionally noted that Dr. Knapp's October 2005 opinion did not specify to which time period he was referring and that Plaintiff was last insured in June, 2003. (Tr. 17) Further, the ALJ highlighted the lack of documentation in the treatment records of restrictions placed on Plaintiff. (Tr. 17) As the ALJ found and the medical evidence supported, none of the other physicians or diagnostic tests supported the alleged degree of Plaintiff's symptoms. (Tr. 15-17) The undersigned finds that substantial evidence supports the ALJ's determination that Dr. Knapp's opinion was inconsistent with the record. See Samons, 2007 WL 2296416 at *3 (finding that substantial evidence supported the ALJ's decision where there were too many inconsistencies in the case).

The undersigned also disagrees with Plaintiff's argument that the ALJ should have contacted Dr. Knapp for further clarification. Such clarification is necessary only where a critical issue is undeveloped or underdeveloped. Id. at *4 (citation omitted). However, where, as in the present case, "an ALJ concludes, based on sufficient evidence, that the treating doctor's opinion is 'inherently contradictory or unreliable,' he or she is not generally required to seek more information from that doctor." Id. Given the Court's finding that the ALJ properly refused to give substantial weight to Dr. Knapp's opinion, the ALJ did not have a duty to contact him. Id. Thus, the undersigned finds that substantial evidence supports the ALJ's RFC finding that Plaintiff could occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; sit 6 hours in an 8-hour workday; stand/walk

6 hours in an 8-hour workday; occasionally stoop and crouch; and push/pull consistent with her lifting limitations.[4] (Tr. 19)

The Plaintiff also argues that the ALJ failed to call a vocational expert due to Plaintiff's alleged nonexertional impairments, including obesity and pain. Plaintiff bases this argument on the assumption that the ALJ erred in his RFC assessment. However, as stated above, substantial evidence supports the ALJ's determination. In the Eighth Circuit, "vocational expert testimony is not required at step four where the claimant retains the burden of proving she cannot perform her prior work . . . . Vocational expert testimony is not required until step five when the burden shifts to the Commissioner, and then only when the claimant has nonexertional impairments, which make use of the medical-vocational guidelines, or 'grids,' inappropriate." Banks v. Massanari, 258 F.3d 820, 827 (8th Cir. 2001) (citations omitted). Here, contrary to Plaintiff's assertion, the ALJ did not rely on the grids in his determination. Instead, as Defendant correctly asserts, the ALJ found at step four that Plaintiff could perform her past relevant work as a child care worker and cook. Thus, the ALJ was not required to obtain vocational expert testimony, even though Plaintiff asserts that she suffers from nonexertional impairments.

Finally, Plaintiff argues that the ALJ failed to properly consider Plaintiff's age as a vocational factor, which was 52 at the time that her insured status expired. Age, however, is only a consideration where the ALJ utilizes the grids. When the burden shifts to the Commissioner at step five, the Commissioner may fulfill this burden by relying on the grids, "'which are fact-based

---

[4] Although Plaintiff argues that the ALJ erroneously dismissed her allegations of a mental impairment, the undersigned reiterates that neither her application nor her hearing testimony alleged any mental problems. Thus, the ALJ was not obligated to consider this claim See Gregg v. Barnhart, 354 F.3d 710, 713 (8th Cir. 2003).

19

generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairments.'" Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001) (quoting Gray v. Apfel, 192 F.3d 799, 802 (8th cir. 1999)). The use of the grids is inappropriate at step five where the plaintiff has nonexertional impairments. Id. As previously stated, the ALJ found that Plaintiff was not disabled at step four. Therefore, he was not required to consider her age as a factor. The undersigned therefore finds that substantial evidence supports the Commissioner's decision that Plaintiff was not disabled as defined by the Social Security Act.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

      /s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this  28th  day of August, 2007.